**This Opinion is a Precedent of the TTAB**
Mailed:
May 27, 2014

**United States Patent and Trademark Office**

Trademark Trial and Appeal Board

————

*Chanel, Inc.*

*v.*

*Jerzy Makarczyk*

————

Opposition No. 91208352

to application Serial No. 85600670

————

Barbara A. Solomon and Anna Leipsic of Fross Zelnick Lehrman & Zissu, P.C. for Chanel, Inc.

Jerzy Makarczyk, *pro se*.[1]

————

Before Cataldo, Lykos and Masiello, Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

On April 17, 2012, Jerzy Makarczyk ("applicant"), a Canadian citizen, filed an application pursuant to Section 1(a) of the Trademark Act to register the mark CHANEL in standard character format for "real estate development and construction of commercial, residential and hotel property" in Interna-

---

[1] At the parties' discovery conference, the Board recommended that applicant obtain legal counsel experienced in trademark matters to represent him in this proceeding. *Board Discovery Conference Order* (February 20, 2013).

tional Class 37.[2] The application alleges May 15, 2008 as the date of first use anywhere and in commerce.

Chanel, Inc. ("opposer") opposed the registration of applicant's mark on the grounds of likelihood of dilution by blurring under Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c); likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d); and false suggestion of a connection under Trademark Act Section 2(a), 15 U.S.C. § 1152(a). Opposer alleged that by virtue of its use and promotion of the CHANEL mark for over 90 years, its mark is "extraordinarily famous and well-known throughout the United States, is inherently distinctive, and has become associated exclusively with opposer." Notice of Opposition ¶ 22. Opposer submitted with its notice of opposition copies of the following registrations, taken from the U.S. Patent and Trademark Office's ("USPTO") Trademark Status and Document Retrieval ("TSDR") database, thereby making them of record pursuant to Trademark Rule 2.122(d)(1).

> Registration No. 302690 for the mark CHANEL in stylized format for "soap" in International Class 3, registered on April 25, 1933;
>
> Registration No. 510992 for the mark CHANEL in stylized format for "perfume, face powder, bath powder and lipsticks" in International Class 3, registered on June 14, 1939;
>
> Registration No. 612169 for the mark CHANEL in stylized format for "necklaces" in International Class 14, registered on September 13, 1955;

---

[2] Application Serial No. 85600670.

Registration No. 902190 for the mark CHANEL[3] for "bracelets, pins and earrings" in International Class 14, registered on November 19, 1970;

Registration No. 906262 for the mark CHANEL for "coats, suits, blouses and scarves" in International Class 25, registered on January 19, 1971;

Registration No. 1177400 for the mark CHANEL for "hats, shawls and belts" in International Class 25, registered on November 10, 1981;

Registration No. 1241265 for the mark CHANEL for "suits, jackets, skirts" in International Class 25, registered on June 7, 1983;

Registration No. 1263845 for the mark CHANEL for "retail store services in the field of clothing and accessories" in International Class 42, registered on January 10, 1984 under Section 2(f) of the Trademark Act;

Registration No. 1347677 for the mark CHANEL for "leather goods, namely, handbags" in International Class 18, registered on July 9, 1985;

Registration No. 1348842 for the mark CHANEL for "full line of perfumery, cosmetics and toiletries" in International Class 3, registered on July 16, 1985;

Registration No. 1510757 for the mark CHANEL for "sunglasses" in International Class 9, registered on November 1, 1988;

Registration No. 1571787 for the mark CHANEL for "watches" in International Class 14, registered on December 19, 1989 under Section 2(f) of the Trademark Act;

Registration No. 1647875 for the mark CHANEL for "keychains" in International Class 6, registered on June 18, 1991;

---

[3] This and the remainder of opposer's pleaded registrations are for the mark CHANEL in typed format. "Prior to November 2, 2003, 'standard character' drawings were known as 'typed' drawings. A typed mark is the legal equivalent of a standard character mark." Trademark Manual of Examining Procedure ("TMEP") § 807.03(i) (Oct. 2013). *See In re Hitachi High-Technologies Corp.*, 109 USPQ2d 1769, 1771 n.2 (TTAB 2014).

Registration No. 1660866 for the mark CHANEL for "make-up brushes" in International Class 21, registered on October 15, 1991; and

Registration No. 1733051 for the mark CHANEL for "leather goods; namely, handbags, wallets, travel bags, luggage, business and credit card cases, change purses, tote bags, cosmetic bags sold empty, and garment bags for travel" in International Class 18, registered on November 17, 1992.[4]

In his answer to the notice of opposition, applicant admitted opposer's ownership of its pleaded registrations as well as the allegation that applicant's applied-for mark is identical to opposer's registered CHANEL mark. In addition, applicant admitted the following:

17. There has never been any relationship between Applicant and Opposer and Opposer never authorized or consented to Applicant's use or application to register the CHANEL mark opposed here.

30. Chanel is not connected with Applicant, Applicant's activities or any of the activities performed by Applicant under the CHANEL mark.

---

[4] Each of opposer's pleaded registrations has been renewed and, with the exception of those registrations issued under the Act of 1905, are registered on the Principal Register. With regard to the registrations issued under the Act of 1905, they are entitled to the benefits of the provisions of the Act of 1946 as though registered on the Principal Register with the exception of certain limitations set forth in Section 46(b), 15 U.S.C. § 1051 note. *See Rolex Watch U.S.A. Inc. v. AFP Imaging Corp.*, 101 USPQ2d 1188, 1191 n.5 (TTAB 2011), *vacated on other grounds, Rolex Watch U.S.A. Inc. v. AFP Imaging Corp.*, 107 USPQ2d 1626 (TTAB 2013). *See also* TMEP § 1601.04 (Oct. 2013).

Otherwise applicant denied the salient allegations therein and asserted various affirmative and putative defenses.[5]

I.     *The Record; Accelerated Case Resolution*

The record includes the pleadings, and pursuant to Trademark Rule 2.122(b), applicant's application file.

The parties stipulated to resolve this proceeding under the summary judgment model of the Board's Accelerated Case Resolution ("ACR") procedure, and are commended for pursuing this expeditious, cost-efficient alternative to trial. *See* "Joint Stipulation of Parties" (TTABVUE Entry #10) (hereinafter referred to as "ACR Stipulation"). *See also* Trademark Board Manual of Procedure ("TBMP") § 528.05(a)(2) ("*Accelerated Case Resolution*") and § 702.04(b) ("*ACR using Summary Judgment Briefs*"). Under the ACR model selected by the parties, in lieu of separate assigned testimony and briefing periods, each party submits a summary judgment style brief with evidentiary submissions attached thereto, effectively merging the trial and briefing periods into a single phase. *See id.* In addition, witness testimony is presented in affidavit or declaration form. *Id.*

---

[5] Concurrent with his answer, applicant submitted excerpts from various internet web sites as well as print-outs from the USPTO TSDR database of third-party registrations purporting to show third-party use and registration of the term "Chanel." In reaching its decision, the Board has not considered these materials. A federal registration may not be made of record merely by attachment to a pleading, except that a plaintiff may make its pleaded registration, showing status and title, of record by attachment to its complaint, pursuant to Trademark Rule 2.122(d). In addition, these submissions are not deemed to be properly made of record under the procedures set forth in the parties' Accelerated Case Resolution ("ACR") agreement.

Pursuant to their ACR agreement, the parties entered into the following procedural stipulations approved by the Board:

(1) Neither party shall conduct discovery or rely on expert testimony;

(2) The parties shall forego trial and an oral hearing;

(3) The parties shall submit summary judgment briefs, accompanied by any evidence, which may be submitted in the form of declarations or affidavits;

(4) The page limit for the parties' briefs shall be the page limit permitted for trial briefs pursuant to Trademark Rule 2.128(b);

(5) The parties are not required to submit separate statements of material fact as part of their briefs;

(6) Evidence may be marked as "Confidential" or "Attorney's Eyes Only" pursuant to the Board's protective order automatically applicable in this proceeding; and

(7) The parties agree that the Board may resolve genuine disputes of material fact and issue a final ruling based on the parties' ACR submissions.

*Chanel Inc. v. Makarczyk*, 106 USPQ2d 1774, 1775 (TTAB 2013) (ACR stipulation approved by Board).

In addition, per their ACR agreement, the parties stipulated to the following facts:

(1) "Applicant does not claim rights in or use of CHANEL in connection with any goods or services including real estate development and construction of commercial, residential and hotel property in the U.S. prior to May 15, 2008";

(2) "Opposer used and registered CHANEL for retail store services, clothing, jewelry, fragrances and beauty items prior to May 15, 2008";

(3) "The opposed mark CHANEL is identical to [o]pposer's trade name CHANEL";

(4) "The opposed mark CHANEL is identical to [o]pposer's federally registered trademark CHANEL";

(5) "Other than the CHANEL mark opposed herein, [a]pplicant does not own any other trademark applications or trademark registrations in the United States that includes [sic] in whole or in part CHANEL";

(6) "Applicant uses in connection with his real estate development and construction of commercial, residential and hotel property services not only the CHANEL mark but also the marks HERMES and PLAYBOY among others";

(7) "Opposer has never given [a]pplicant any consent or permission or otherwise authorized [a]pplicant to use or register the CHANEL mark in connection with any goods or services"; and

(8) "There is no connection or affiliation between [o]pposer and either [a]pplicant or [a]pplicant's goods or services."

*Id*. at 1775-6.

Opposer timely submitted a summary judgment styled ACR brief accompanied by the following declarations with exhibits attached thereto: (1) Veronica L. Hrdy, opposer's Vice-President/General Counsel; (2) Taryn Looney, opposer's Associate Counsel; and (3) Barbara Cirkva, opposer's Division President, Fashion, Watches and Fine Jewelry. Portions thereof have been designated confidential. In addition, opposer properly made of record its pleaded registrations with its notice of opposition.

Applicant filed neither a brief nor evidence. Nonetheless, as plaintiff in this proceeding, opposer bears the burden of proving its standing and claims by a preponderance of the evidence.

II.    *The Parties*

Opposer was founded by fashion designer Gabrielle "Coco" Chanel who entered the fashion business in 1910 in Paris, France with the opening of a small millinery shop under the name "Chanel Modes." Cirkva Declaration, ¶ 4. Following the popularity of her custom designed hats, she expanded her product line to clothing. *Id.* In 1913, she opened a fashion boutique in Deauville, France and then, in 1915, her first couture house in Biarritz, France. *Id.* The following year, Coco Chanel received acclaim from the U.S. press for her "charming chemise dress." *Id.* at ¶ 5. In 1921, she introduced her first perfume, CHANEL No. 5, which continues to be one of the best-selling fragrances on the market today. *Id.* She began designing and selling costume jewelry in 1924. *Id.* Later, in 1926, she became known for her design of the "little black dress." Following World War II, she reestablished herself as a fashion designer with the introduction of the "now-classic" quilted fabric handbag with chain and leather shoulder strap, marketed under the CHANEL brand name. *Id.* at ¶¶ 6 and 8. In the 1950s, Stanley Marcus, owner of the U.S. department store Neiman Marcus, honored Coco Chanel with an award as the most influential fashion designer of the twentieth century. When Coco Chanel passed away in 1971, all rights in her name and business were assigned to opposer and related companies. *Id.* at ¶ 9. Shortly thereafter, opposer launched a full line of cosmetics under the name CHANEL BEAUTÉ as well as a retail store collection of ready-to-wear clothing and accessories under the name CHANEL

BOUTIQUE. *Id.* Opposer's clothing product line varies each year, with at least six different ready-to-wear collections and two *haute couture* collections annually. *Id.* at ¶ 15.

Opposer commenced use of CHANEL in the United States as a trademark and trade name at least as early as the 1930s. *Id.* at ¶11. Currently opposer owns 60 active U.S. registrations consisting of or comprising the term CHANEL. Hrdy Declaration, ¶ 4, Ex. 63. Opposer markets luxury consumer products in the United States in various trade channels, including opposer's own CHANEL boutiques and third-party retailers such as Saks Fifth Avenue and Neiman Marcus. Cirkva Declaration at ¶¶ 21-23. The price-point for opposer's goods ranges from nail polish retailing at $27 and sunglasses at $300 to handbags and *haute couture* clothing items costing thousands of dollars. *Id.*

Applicant, a citizen of Canada who resides and conducts business in Toronto, has applied to register the mark CHANEL for "real estate development and construction of commercial, residential and hotel property." Applicant operates several web sites involving the sale or leasing of real property, including www.condomonde.com, www.condominiums.com, and www.hermesrealty.ca. Looney Declaration ¶ 6, Exs. 74 and 81. As a part of his marketing strategy, applicant promoted on his web site a building with units apparently named after luxury brands including Chanel, Givenchy, Cartier, Versace and Dior. Looney Declaration, ¶ 7. Applicant has also used the

name Hermes and the mark Playboy in connection with his services. *Id.*; ACR Stipulation.

III. *Standing*

Opposer has demonstrated that it is the owner of its pleaded registrations for the mark CHANEL, in both standard character format and stylized lettering, and that the registrations are valid and subsisting by submitting with its notice of opposition printouts obtained from the USPTO electronic database records showing the current status and title of its pleaded registrations. In view of its ownership of these registrations for the same mark as that of applicant, opposer has established its standing. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

IV. *Dilution by Blurring*

First, we consider opposer's claim of dilution by blurring. The Trademark Act provides a cause of action for the dilution of famous marks. *See* Sections 13 and 43(c) of the Trademark Act, 15 U.S.C. §§ 1063 and 1125(c). Section 43(c) provides as follows:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Opposer contends that applicant's applied-for CHANEL mark will dilute the distinctiveness of opposer's CHANEL mark. The Trademark Act defines dilution by blurring as follows:

> "[D]ilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.

Section 43(c)(2)(B) of the Trademark Act, 15 U.S.C. § 1125(c)(2)(B). "Dilution diminishes the 'selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public.'" *Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164, 1182 (TTAB 2001) (internal citation omitted) ("*Toro*").

Our primary reviewing court, the Court of Appeals for the Federal Circuit, has set forth the following four elements a plaintiff must prove in order to prevail on a claim of dilution by blurring in a Board proceeding:

> (1) that plaintiff owns a famous mark that is distinctive;
>
> (2) the defendant is using a mark in commerce that allegedly dilutes the plaintiff's famous mark;
>
> (3) the defendant's use of its mark began after the plaintiff's mark became famous; and
>
> (4) the defendant's use of its mark is likely to cause dilution by blurring.

*Coach Services Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1723-24 (Fed. Cir. 2012) ("*Coach Services").*[6]

A. **Whether opposer's CHANEL mark is famous and distinctive**

Under §1125(c)(2)(A), a mark is "famous" for dilution purposes —

… if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

---

[6] *Coach Services* involved a use-based application filed pursuant to Section 1(a) of the Trademark Act. In previous decisions involving intent-to-use applications filed under Section 1(b), the Board applied the following three-prong test for dilution by blurring in opposition proceedings:

1. Whether opposer's mark is famous;

2. Whether opposer's mark became famous prior to applicant's date of constructive use; and

3. Whether applicant's mark is likely to cause dilution by blurring the distinctiveness of opposer mark.

*See e.g., National Pork Board v. Supreme Lobster and Seafood Co.,* 96 USPQ2d 1479, 1494-5 (TTAB 2010).

Opposer has the burden of establishing that its mark has become famous. "It is well-established that dilution fame is difficult to prove." *Coach Services*, 101 USPQ2d at 1724, *quoting Toro,* 61 USPQ2d at 1180.  As noted in the statute, fame for dilution requires "widespread recognition by the general public." *Coach Services,* 101 USPQ2d at 1725, *citing* 15 U.S.C. § 1125(c)(2)(A). An opposer must show that, when the general public encounters the mark "in almost any context, it associates the term, at least initially, with the mark's owner." *Id.*, *quoting Toro,* 61 USPQ2d at 1180. A famous mark is one that has become a "household name." *Coach Services,* 101 USPQ2d at 1725 (internal citations omitted).

In addition, "a mark must be not only famous, but also so distinctive that the public would associate the term with the owner of the famous mark even when it encounters the term apart from the owner's goods or services, i.e., devoid of its trademark context." *Toro*, 61 USPQ2d at 1177, *citing* H.R. REP. No. 104-374, at 3 (1995) ("the mark signifies something unique, singular, or particular"). The requirement of "distinctiveness" is derived from Section 43(c), which provides that distinctiveness of a famous mark can be shown

either through inherent or acquired distinctiveness.[7] Fame and distinctiveness are "two overlapping, but slightly different, concepts." *Toro*, 61 USPQ2d at 1177. That is to say, "[a] trademark cannot be 'famous' unless it is 'distinctive,' but it can certainly be 'distinctive' without being 'famous.' A designation cannot be a trademark at all unless it is 'distinctive.' By definition, all 'trademarks' are 'distinctive'—very few are 'famous.'" 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:104 (4th ed. 2014).

Taking into account the non-exhaustive factors enumerated above as well as other considerations, we find that opposer has established that its mark CHANEL is famous for dilution purposes. At the outset we note that opposer owns numerous registrations for the mark CHANEL on the Principal Register (or equivalent thereof) which continue to be valid and subsisting, the first of which was registered in the United States in 1933, over eighty years ago. The record is devoid of any third-party registrations of similar marks.

According to the record, the CHANEL mark was first used in connection with fragrances and beauty products in the 1920s. Cirkva Declaration,

---

[7] In 2006, Congress enacted the Trademark Dilution Revision Act ("TDRA") and amended Section 43(c) of the Trademark Act of 1946 to overrule the view in some federal courts that its predecessor, the Federal Trademark Dilution Act (" FTDA") applied only to inherently distinctive marks. *See, e.g., Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 51 USPQ2d 1882, 1887 n.2 (2d Cir. 1999) ("We think the inclusion of the requirement of distinctiveness was intended, for good reason, to deny the protection of the statute to non-distinctive marks."); *Savin Corp. v. Savin Group*, 391 F.3d 439, 73 USPQ2d 1273 (2d Cir. 2004), *cert. denied*, 126 S. Ct. 116, 163 L. Ed. 2d 64 (2005) (the surname SAVIN used as a mark is "not as obviously distinctive as, for example 'Honda' or 'Acura.' ").

¶12, Exs. 1-2. Opposer further testified that "the CHANEL mark was being used in connection with clothing and related products" by the late 1950s and early 1960s, and that "since then, the CHANEL mark continues to be used on clothing and fashion accessories, including handbags, belts, scarves, shoes, sunglasses and costume jewelry." *Id*.[8]

For many years, opposer has enjoyed an "extraordinary level of success" in the United States. Cirkva Declaration, ¶ 16. Opposer's U.S. revenues from sales under the CHANEL trademark for over a decade preceding trial are of record and designated confidential; suffice it to say, the annual figures are extremely high in terms of both dollar value and units sold. Cirkva Declaration, ¶ 16. Currently, in the United States and its territories, there are twenty-nine Chanel boutiques bearing the CHANEL brand name on their signage selling a broad range of fashion products with the CHANEL mark. Cirkva Declaration, ¶ 22. In addition, opposer sells its clothing, footwear, leather goods, watches and fine jewelry and other fashion-related accessories under the CHANEL brand through 120 "hand-selected" third-party merchandisers such as Saks 5th Avenue and Neiman Marcus. *Id*. at ¶ 23. Since 1998, CHANEL branded fragrance and beauty products have been sold at "thousands" of "authorized points of sale" in the United States, and opposer's eyewear products have been available at large retailers such as Lenscrafters and Sunglass Hut. *Id*. In

---

[8] Because opposer's founder Coco Chanel did not keep an archive of opposer's products "it is difficult to pinpoint exactly when the CHANEL mark was first used in connection with a particular product." Cirkva Declaration, ¶ 12.

2000, opposer began operation of the www.chanel.com web site under the trade name CHANEL, which was still active at the time of trial. *Id*. at ¶ 24. Since 2005, opposer has offered for direct sale to consumers via its web site its CHANEL branded beauty and fragrance products. The U.S. web site has received significant traffic, with 3.5 million visits in 2005, 5.3 million visits in 2006, 6.9 million visits in 2007, 6.8 million visits in 2008, 8.3 million visits in 2009, 13 million visits in 2010, 14.4. million visits in 2011, and 16.1 million visits in 2012. *Id*.

Opposer's advertising and promotional expenditures in connection with its CHANEL branded products are substantial. From 2000-2007, opposer spent over $275 million in advertising and promoting its CHANEL mark in the United States. *Id*. at ¶ 26. In 2008 alone, opposer's advertising and promotion expenditures exceeded $50 million. *Id*. From 2009-2012, opposer spent over $200 million on advertising and promotion. *Id*. The largest percentage of opposer's advertising budget is devoted to print advertisements that regularly appear in magazines and newspapers circulated on both a regional and national level. *Id*. at ¶ 27. Since 1998, print advertisements promoting the CHANEL brand have appeared in sixty-six (66) different magazines with a national circulation, fourteen (14) different regional publications, and ten different trade publications. *Id*. In addition to magazines devoted to fashion such as *Vogue, Glamour, Harper's Bazaar* and *Elle*, opposer advertises in men's magazines such as *GQ, Men's Journal* and *Golf Digest* as well as general in-

terest magazines such as *People, Vanity Fair* and *The New Yorker* and newspapers with a large, general circulation such as *The New York Times. Id.* Opposer also advertises in trade publications such as *Beauty Biz* and *Beauty Fashion.* Thus, the record supports a finding that opposer's print advertising campaign reaches both genders at various income levels.

In addition to print media, opposer advertises its CHANEL mark prominently in cable and network television as well as outdoor media such as billboards and bus shelters. *Id.* at ¶ 28. More recently, opposer has significantly expanded consumer exposure to its CHANEL brand name by launching an extensive advertising campaign using social media such as Facebook, YouTube, Twitter, Google+, Vimeo and Linkedin. *Id.* at ¶ 29. Opposer's Facebook page has attracted 9.5 million fans since its inception in 2009. *Id.* In August 2010, opposer introduced a YouTube page which has gained over 100,000 subscribers and almost 40 million views. *Id.* Opposer's Twitter page, launched in 2011, has over 2 million followers. *Id.* Opposer's Google+ page created in 2012 has over 900,000 "+1's" and over 600,000 users' "circles." Also in 2012, opposer began using LinkedIn as a social media vehicle to advertise its CHANEL branded products which has garnered the attention of over 80,000 followers. *Id.* Opposer's Vimeo page launched in 2013 has drawn over 185,000 views. *Id.* As further testament to CHANEL's widespread recognition, despite opposer's lack of an official Pinterest account, CHANEL was ranked as the number one

shared fashion brand, with 150,000 shares, 58 million total impressions, and an average of 56 "pins" per day and 1244 "re-pins" daily. *Id*. at ¶ 38.

The substantial amount of advertising by third-parties also increases consumer exposure to opposer's mark. Third-parties authorized to sell opposer's CHANEL products online (such as Macy's and Nordstrom via macys.com, and Nordstrom.com, respectively) advertise opposer's CHANEL branded products via direct mailings, catalogs, and point of purchase displays. *Id*. at ¶ 31, Ex. 9. From 2000-2007, such third-party advertising collectively amounted to $29 million; between 2008 and 2012, the figure was $ 33 million. *Id*.

Generations of prominent celebrities have either endorsed or appeared in advertisements for CHANEL-branded merchandise, including Catherine Deneuve, Marilyn Monroe, Nicole Kidman, Keira Knightley, Christy Turlington, Kate Moss and Brad Pitt. *Id*. at ¶ 30, Exs. 7 and 8. In addition to these formal celebrity endorsements and paid advertisements, prominent celebrities and fashion icons such as Beyoncé, Penelope Cruz, and Sarah Jessica Parker are frequently photographed either carrying CHANEL-branded handbags or wearing CHANEL fashions. *Id*. at ¶ 32. Such photographs frequently appear in publications in which opposer does not advertise (for example, in tabloid magazines), thereby broadening the exposure of opposer's CHANEL mark. *Id*.

Opposer also garnered unsolicited publicity in newspaper and magazine articles. *Id.* at 34. We note the following representative examples:[9]

> "Only the best for your plastic. Your credit cards work hard for you. The least they deserve is to rest in the pinnacle of luxury that is Chanel." The Atlanta Journal Constitution (November 27, 2005) (Cirkva Declaration Ex. 16);

> "Chanel, the brand famous for high-end accessories with chain straps and camellias…" *Los Angeles Times* (March 9, 2008) (Cirkva Declaration Ex. 23);

> "Take that most famous of quilted fashion items, the gold-chained Chanel handbag." *W* Vol. 36, Issue No. 9 (September 1, 2007) (Cirkva Declaration Ex. 18).

In addition, CHANEL branded products are frequently the subject of fashion and beauty articles and product reviews. Cirkva Declaration, ¶ 33, Exs. 12 and 13. For example, when opposer recently reintroduced its originally styled watch, it garnered considerable media attention. See for example "Chanel Introduces Its Premier Watch," Elle.com; "What I Covet: Chanel's Premiere Watch," *Time* April 29, 2013 (Mikva Declaration, Ex. 13).

Opposer's CHANEL mark has been consistently ranked as one of the most recognized and famous brands in the United States. In 2012, *Women's Wear Daily* ranked Chanel as the eighth most recognized designer brand and also ranked it in the  top ten beauty brands. Mikva Declaration ¶ 36, Exs. 32-33. As measured by Facebook "likes," Chanel was ranked fifth amongst fashion brands. *Id*. at Ex. 34. The CHANEL brand has appeared in the top 100 in-

---

[9] Articles submitted by opposer from foreign publications (e.g. *The Economist*) have not been considered insofar as opposer did not provide evidence of U.S. circulation.

ternational brands as ranked by Interbrand and reported in *BusinessWeek* each year between 2001 and 2009. *Id.* at Ex. 35. In 2010-12, Millward Brown ranked the CHANEL brand in the top five luxury brands worldwide based on brand value. *Id.* at Ex. 36. In 2010 and 2012, *Fashionista.com* ranked Chanel number four for luxury brands. *Id.* at Ex. 38. *Luxury Daily.com* reported CHANEL as among the ten most searched handbag brands on the internet in 2012. *Id.* at Ex. 40.

Opposer's products sold under the CHANEL mark have received numerous industry-specific awards. For instance, opposer's CHANEL perfumes and fragrances (and in particular CHANEL No. 5) have received numerous "FiFi" awards from The Fragrance Foundation, which are considered the "Oscars" of the fragrance industry, including awards for best media campaign (2003, 2010, 2013), best commercial (2008) and best women's and men's prestige fragrance (2002 and 2003, 1999 and 2011 respectively). *Id.* at ¶ 41, Ex. 52. In 2012, the Jewelry Information Center awarded opposer a GEM award for raising the visibility and status of fine jewelry and watches. *Id.* at Ex. 54.

The CHANEL brand name and its founder, Coco Chanel, have been the subject of numerous fiction and non-fiction books. *Id.* at ¶ 42, Ex. 55. In 2005, the Metropolitan Museum of Art in New York City staged an exhibit devoted exclusively to the fashions of Chanel with celebrities Nicole Kidman, Jennifer Connelly and the Olsen twins recounting the history of Chanel through the ensembles they wore. *Id.* at ¶ 43, Ex. 56. Opposer celebrated the seventieth

anniversary of its fine jewelry debut with an exhibit adjacent to the Museum of Modern Art in New York, which was widely reported in the *New York Times, Wall Street Journal, Time, Vogue and Elle. Id.* at Ex. 46. Opposer "constantly" receives requests for permission from third-parties to allow references to CHANEL branded products in films, television programs, books and advertisements. *Id.* at ¶ 44. Opposer stated that because it is "very protective of the Chanel mark since it is one of [our] most important assets, Chanel normally declines such requests." *Id.* Nonetheless, opposer does occasionally grant permission to certain media vehicles reaching a wide demographic audience. Clothing and accessories bearing the CHANEL mark have appeared in movies and television shows reaching a wide range of audiences such as *The Simpsons* (1996), *West Wing* (2000), *Austin Powers 3* (2002), *Elf* (2003), *Spiderman 3* (2005), *The Devil Wears Prada* (2006), and *Sex in the City* (television 1998 and 2004; movie 2008). *Id.*

The consumer recognition survey evidence introduced by opposer is also particularly persuasive. Over the past six years, for internal business purposes, opposer has commissioned multiple consumer surveys demonstrating that its mark CHANEL is extremely well known and enjoys an unusually high degree of unaided and aided[10] recognition.[11] The fact that these surveys were

---

[10] "Unaided" awareness indicates that the survey participant spontaneously mentions the CHANEL brand name without prompting; "aided" awareness means that the survey participant responds "yes" when asked whether he or she is aware of the CHANEL brand name. Cirkva Declaration ¶ 45.

commissioned prior to the instant litigation and were used in the ordinary course of business increases their probative value.

Opposer's consistent history of U.S. advertising on multiple platforms such as print and social media, its extremely high sales figures and its high degree of unsolicited media attention and unaided consumer recognition, support the finding that CHANEL enjoys widespread recognition among the general public and is a "household name" synonymous with high fashion and style for the products and services identified in its pleaded registrations, and is therefore famous for dilution purposes. *See Coach Services,* 100 USPQ2d at 1725. *See also Thane International, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 64 USPQ2d 1564, 1575 (9th Cir. 2002) (the transformation of a term into a truly famous mark means that "the mark must be a household name.").

We further find that in addition to being famous for dilution purposes, opposer's CHANEL mark is distinctive as well.

The record shows that opposer's CHANEL mark is derived from the surname of its founder Coco Chanel, and that some, but not all, of opposer's marks are registered under Section 2(f). Even assuming that applicant's mark is not inherently distinctive, the record evidence discussed above more than sufficiently demonstrates that opposer's mark has acquired distinctiveness, and is therefore "distinctive" within the meaning of Section 43(c) of the Act.

---

[11] Opposer designated this evidence and supporting statements as confidential.

B.      **Whether applicant is using a mark in commerce that allegedly dilutes opposer's famous mark**

Opposer, as plaintiff in this proceeding, must also prove that applicant is using a mark in commerce that allegedly dilutes opposer's famous mark. *Coach Services Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1723-24. This prong of the dilution analysis is derived from the statutory language requiring that the defendant has commenced use of a mark in commerce. 15 U.S.C. §1125(c)(1). Before considering whether opposer has satisfied the second prong as set forth in *Coach Services*, *supra,* we shall briefly examine the history of dilution claims before the Board.

Prior to 1995, the Board did not recognize dilution as a viable claim in either opposition or cancellation proceedings. *See e.g.*, *Geo. A. Dickel Co. v. General Mills, Inc.*, 317 F.2d 954, 137 USPQ 891, 892 (CCPA 1963); *K2 Corp. v. Philip Morris Inc.*, 192 USPQ 174, 177 (TTAB 1976), *aff'd,* 555 F.2d 815, 194 USPQ 81 (CCPA 1977); *Max Factor & Co. v. Clairol Inc.*, 163 USPQ 240, 243 (TTAB 1969). In 1995, Congress passed the Federal Trademark Dilution Act of 1995 ("FTDA"), 15 U.S.C. §§ 1125(c), 1127, which created a federal cause of action for trademark dilution. While the FTDA amended Section 43 of the Trademark Act to provide for federal claims of dilution, it did not add dilution as a ground for either opposition to an application or cancellation of a registration before the Trademark Trial and Appeal Board. Thus, when the issue of applicability of federal dilution claims under the FTDA to Board proceedings was considered a year later in the case of *Babson Bros. Co. v. Surge*

*Power Corp.*, 39 USPQ2d 1953 (TTAB 1996), the Board held that while the FTDA provided "a federal cause of action in courts," it did not explicitly or implicitly provide a new ground for opposition or cancellation in Board *inter partes* proceedings. *Babson Bros.*, 39 USPQ2d at 1954-55. Congress subsequently amended Sections 13 and 14 of the Trademark Act to explicitly state that dilution is an available ground in opposition or cancellation proceedings before the Board. Trademark Amendments Act of 1999 ("TAA"), Pub. L. No. 106-43, 113 Stat. 218. *See* Cong. Rec. June 22, 1999, S7453-54 (1999) (statement of Sen. Hatch referring specifically to the Board's decision in *Babson, supra.*). The new legislation was intended to "provide holders of famous marks with a right to oppose or seek cancellation of a mark that would cause dilution as provided in the [Federal Trademark] Dilution Act." H.R. Rep. No. 106-250, at 5 (1999). The pertinent language for opposition proceedings now reads as follows: "[a]ny person who believes that he would be damaged by the registration of a mark upon the principal register, *including as a result of dilution under section 1125(c) of this title*, may … file an opposition in the Patent and Trademark Office." 15 U.S.C. §1063(a) (2000) (emphasis added).

In *Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164 (TTAB 2001), the Board was confronted with the issue of whether a dilution claim can be entertained in an opposition proceeding against an application based on Section 1(b) of the Act (intent-to-use). The Board examined the legislative history of the TAA, and answered this question in the affirmative, reasoning:

Such applications are often published for opposition prior to the applicant's using the mark in commerce. Thus, many opposition proceedings involve marks that are not actually used. If marks based on an intent to use could not be opposed on the ground of dilution, the intent of Congress to provide for the "[r]esolution of the dilution issue before the Board, as opposed to the Federal District Court, [and thereby] result in more timely, economical, and expeditious decisions" would be frustrated. H.R. REP. No. 106-250, at 5 (1999). *To require actual use by the applicant before a dilution claim could be recognized at the Board would, practically speaking, result in most dilution claims being brought as cancellation proceedings or in district court. Since the Board cannot issue injunctions, once a party has begun using the mark in commerce, it is much more likely that the focus will shift to the Federal courts. This would defeat the articulated purpose of the TAA.* Therefore, we hold that an application based on an intent to use the mark in commerce satisfies the commerce requirement of the FTDA for proceedings before the Board.

*Id*. at 1174 (emphasis added).

Subsequent to *Toro*, Congress enacted the Trademark Dilution Revision Act of 2006 ("TDRA") which supersedes the FTDA and amends Section 43(c), 15 U.S.C. § 1125(c).[12] While the TDRA removed the requirement of

---

[12] Some of the key provisions of the TDRA include reversing the Supreme Court's ruling in *Moseley v. Secret Catalogue, Inc.*, 537 U.S. 418 (2003) which required proof of "actual dilution" instead of a "likelihood" of dilution and clarifying that the owner of a mark must demonstrate fame among "the general consuming public of the United States," as opposed to fame in a niche market. In addition, Section 43 was amended to expand the federal registration defense to include all types of dilution claims under state law by replacing the FTDA's language barring only claims for "dilution of the distinctiveness of a mark" with language barring claims for "dilution by blurring or dilution by tarnishment." H.R. 683, 109th Cong. 1st. Sess., 6 (Feb. 9, 2005). In *Academy of Motion Picture Arts and Sciences v. Alliance of Professionals and Consultants Inc.*, 104 USPQ2d 1234 (TTAB 2012), the Board interpreted the federal registration defense of the TDRA, as originally promulgated, as bar to all claims of dilution in cancellation proceedings before the Board(respondent's motion to dismiss petitioner's dilution claim granted; under the TDRA, ownership of a federal registration acts as a complete bar to assertion of a dilution claim before the Board). In October 2012, the TDRA was amended to clarify that the federal registration defense applies only to dilution claims under state law. Thus, *Academy of Motion Picture Arts and*

"commercial" use in commerce, it left open the question of what constitutes use in commerce.

Keeping in mind that the purpose of an opposition proceeding is to determine an applicant's right to a federal registration, we hold that an opposer asserting a dilution claim in a Board proceeding against an application based on an allegation of actual use in commerce pursuant to Section 1(a) may prove applicant's use in commerce by direct evidence or may rely on the application filing date as the date of constructive use.[13] *See Coach Services,* 101 USPQ at 1725, *citing Toro,* 61 USPQ2d at 1174 (the owner of a famous mark must demonstrate that its mark became famous "prior to the filing date of the trademark application or registration against which it intends to file an opposition or cancellation proceeding"). We believe this interpretation of the requirement of use in commerce embodied in the statute to be consistent with the stated purpose of the TAA which was to permit parties to bring dilution claims in Board proceedings "before dilution type damage has been suffered in

---

*Sciences v. Alliance of Professionals and Consultants Inc.*, has been superseded by the amendment of the TDRA.

[13] The constructive use provisions set forth in Section 7(c) of the Trademark Act provide that "[c]ontingent on the registration of a mark on the principal register provided by this Act, the filing of the application to register shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect … against any other person except for a person … who, prior to such filing (1) has used the mark…"15 U.S.C. §1057(c). In adopting the principle of constructive use in connection with the advent of intent-to-use applications, Congress intended to eliminate both the business uncertainty for applicants seeking to introduce new brand product names into the marketplace as well as the legal fiction of token use. S. Rep. No. 101-515, 100th Cong., 2d Sess. (1988).

the marketplace by the owner of a famous mark." H.R. Rep. No. 106-250, at 5 - 6 (1999). Otherwise, "[i]f we interpreted the TAA in a wooden manner, most owners of famous marks would not be able [sic] bring dilution claims at the Board against an application based on an intent to use or even limited actual use. Such an interpretation would render the TAA virtually meaningless." *Toro*, 61 USPQ2d at n.7 (internal citation omitted).

In the present case, opposer did not directly address this element in its ACR brief. Rather, opposer in its introductory remarks points to the parties' ACR stipulation regarding applicant's concession that he did not make use in the United States of his CHANEL mark prior to the date of first use alleged in his application. ACR Stipulation ¶ 3. Opposer further argues that applicant's specimen of use does not show use in the United States and that opposer cannot locate any use. Opposer's ACR Brief, p. 19. Nonetheless, as noted above, opposer is entitled to rely on applicant's filing date as applicant's date of constructive use. Opposer has therefore satisfied this second prong.

C.   **Whether opposer's CHANEL mark became famous prior to applicant's use**

The third prong requires the owner of a famous mark to demonstrate that its mark became famous prior to applicant's established use or filing date. 15 U.S.C. § 1125(c). In this case, because we have no evidence of applicant's use we must determine if opposer's mark became famous "prior to the filing date of the trademark application or registration against which it intends to file an opposition or cancellation proceeding." *Coach Services,* 101

USPQ2d at 1725, *citing Toro,* 61 USPQ2d at 1174.[14] The vast majority of the evidence in the record about the fame of opposer's CHANEL trademark pre-dates the April 17, 2012 filing date of applicant's application. Therefore, we find that the fame of the CHANEL mark was well-established prior to applicant's filing date i.e. applicant's constructive use date.

D.   **Whether applicant's CHANEL mark is likely to cause dilution by blurring the distinctiveness of opposer's CHANEL mark.**

Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," 15 U.S.C. § 1125(c)(2)(B), and may be found "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury," 15 U.S.C. § 1125(c)(1). Dilution by blurring occurs when a substantial percentage of consumers, upon seeing the junior party's use of a mark on its goods or services, are immediately reminded of the famous mark and associate the junior party's use with the owner of the famous mark, even if they do not believe, for example, that the goods or services come from the famous mark's owner, or that the famous mark's owner approves the goods or services. *See e.g., Nike Inc. v. Maher*, 100 USPQ2d 1018 (TTAB 2011); *National Pork Board v. Supreme Lobster and Seafood Co.,* 96

---

[14] Applicant did not attempt to show it made actual use of its applied-for CHANEL mark in commerce prior to the date opposer's CHANEL mark attained fame for dilution purposes. *Cf. Citigroup Inc. v. Capital City Bank Group Inc.,* 94 USPQ2d 1645, 1650, n.13 (TTAB 2010), *aff'd Citigroup Inc. v. Capital City Bank Group Inc.,* 98 USPQ2d 1253 (Fed. Cir. 2011) (intent-to-use applicant asserting any use prior to its filing date is required to plead such use as an affirmative defense to dilution claim).

USPQ2d 1479 (TTAB 2010). In addition, we must determine not only whether there is an 'association' arising from the similarity of the marks, but whether such association is likely to 'impair' the distinctiveness of the famous mark. *Nike Inc. v. Maher*, 100 USPQ2d 1018, 1023 (TTAB 2011) ("*Nike v. Maher*"). In determining whether a mark or trade name is likely to cause dilution by blurring, the Board may consider the following six non-exhaustive factors:

(i) The degree of similarity between the mark or trade name and the famous mark.

(ii) The degree of inherent or acquired distinctiveness of the famous mark.

(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv) The degree of recognition of the famous mark.

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B)(i)-(vi).

### 1. **The degree of similarity between the mark or trade name and the famous mark**

In this case, there is no dispute that the marks in question are identical. Indeed, applicant admitted in his answer and also stipulated that his applied-for mark CHANEL is identical to opposer's mark and trade name CHANEL. *See* ACR Agreement, "Stipulation of Fact" ¶ 4. This factor therefore favors finding a likelihood of dilution by blurring.

2. **The degree of inherent or acquired distinctiveness of the famous mark**

"This factor requires us to analyze how distinctive or 'unique' the mark is to the public. The inquiry is made even when it is undisputed that opposer's mark is registered on the Principal Register." *NASDAQ Stock Market Inc. v. Antartica S.r.l.,* 69 USPQ2d 1718, 1735 (TTAB 2003). "The more inherently distinctive and memorable the mark, the more it is likely to be blurred by the use of other identical or similar marks. The more descriptive the mark, the less likely it is to be blurred by uses of identical or similar marks." Testimony of Anne Gundelfinger, President, International Trademark Association, before House Subcommittee on Courts, the Internet and Intellectual Property, Committee on the Judiciary, February 17, 2005 (109th Cong., 1st Sess.), 2005 WL 408425.

As noted above, opposer's mark CHANEL was originally derived from the designer Coco Chanel's surname. The origin of opposer's brand name, however, does not diminish its distinctiveness. Indeed, opposer has submitted voluminous evidence that the media uses the term CHANEL to refer solely to opposer. In any event, the discussion above regarding opposer's extensive evidence of fame of the CHANEL mark used in connection with clothing, fashion accessories, beauty products and boutiques more than sufficiently establishes that opposer's CHANEL mark has acquired a high degree of distinctiveness among consumers. This factor therefore also favors a finding of likelihood of dilution.

### 3. **The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark**

The record reflects that opposer has indeed engaged in "substantially exclusive" use of its CHANEL mark. Opposer stated that due to the fame and value of its CHANEL mark, it vigorously enforces its exclusive use and only permits one other unrelated third-party, Luxottica S.r.L., licensed permission to use the CHANEL mark in connection with eyewear products. Hrdy Declaration, ¶¶ 5 and 6; Cirkva Declaration, ¶ 25. The Luxottica license agreement contains "strict quality standards to ensure that products bearing the CHANEL mark meet the same standards for which Chanel has long been known." *Id.*

In addition, opposer stated that it expends a "great deal of resources policing the CHANEL mark," employing a trademark watch service to monitor third-party use. Hrdy Declaration ¶ 6. This statement is corroborated by the record evidence showing that from 1998 to the present, opposer has filed over one hundred (100) trademark infringement lawsuits and sent over one-thousand (1,000) cease and desist letters, leading the New York Times in 2007 to identify opposer as one of the top ten filers of trademark suits. *Id.* at ¶¶ 7 and 10. This includes eight opposition proceedings before the Board, and seventeen successful domain name disputes before WIPO. *Id.* at ¶¶ 10-11. The record further shows no other unconsented uses of the mark CHANEL by third parties. Accordingly, on this record, we find that opposer has made sub-

stantially exclusive use of the CHANEL trademark, and therefore, this dilution factor favors opposer.

### 4. **The degree of recognition of the famous mark**

The discussion of fame above shows that opposer's CHANEL mark enjoys a high degree of recognition among consumers. In particular we note the following: opposer's surveys conducted in the ordinary course of business showing a high degree of unaided consumer recognition; third-party consumer recognition surveys in both print and social media form (e.g. *Women's Wear Daily, Businessweek,* Facebook); the extensive level of unsolicited third-party media coverage; and the number of prestigious industry awards. Such evidence demonstrates that CHANEL is widely recognized by the general consuming public as a mark identifying opposer's particular style of clothing, fashion accessories, fragrances, beauty products and retail services. This high degree of consumer recognition favors opposer.

### 5. **Whether the user of the mark or trade name intended to create an association with the famous mark**

Opposer has presented evidence demonstrating that applicant intended to create an association with opposer's famous CHANEL mark, despite the fact that opposer never licensed applicant to use the mark (either orally or in writing) and has never even conducted any business with applicant. ACR Agreement "Stipulation of Facts" ¶ 7 and 8; Answer ¶ 2.17; Looney Declaration, ¶¶ 4 and 7. According to publicly available evidence opposer obtained from applicant's websites, www.condomonde.com and

www.condominiums.com, applicant markets luxury rental properties by naming units after luxury brands such as Chanel, Dior, Givenchy, and Versace. Looney Declaration, ¶ 7, Exs. 77 and 79. Applicant stated on his web site that opposer Chanel is among his former or current clients, referring to the Chanel boutiques as "the world's finest" along with other fashion houses such as Louis Vuitton, Prada and Gucci. Looney Declaration, ¶ 7, Exs. 77 and 79. Indeed, applicant, in promoting his services on his web site, has referred to the elevated status he purportedly enjoys from his relationship with Chanel. *Id*. at Ex. 78. Opposer's corporate counsel testified however that opposer "has not done business with the applicant, nor have we licensed the CHANEL mark to him." *Id*. at ¶ 7.

We therefore find that applicant is attempting to trade on the goodwill and fame generated by the CHANEL mark in order to promote and market his own services. As such, this dilution factor also favors opposer.

> 6. **Any actual association between the mark or trade name and the famous mark**

Insofar as opposer presented no evidence regarding this factor, it is deemed neutral.

In summary, each factor, with the exception of the sixth factor discussed above which was deemed neutral, favors a finding of likelihood of dilution.

> 7. **Impairment**

The statute requires opposer to prove impairment of the distinctiveness

of opposer's famous mark. *See Nike Inc. v. Maher*, 100 USPQ2d at 1023. *See also Louis Vuitton Malletier S.A. v. Haute Diggity Dog LLC*, 507 F.3d 252, 84 USPQ2d 1969 (4th Cir. 2007). Opposer stated that if applicant were to obtain a registration, "his use of our very mark will devalue the CHANEL brand and cause significant harm to Chanel by diluting the distinctiveness of Chanel's famous mark." Cirkva Declaration, ¶ 51. We note that although opposer has no current involvement in the real estate or hotel industry, the record shows that many luxury brand companies have licensed use of their marks in connection with hotels. Looney Declaration ¶ 10, Ex. 82. In other words, they have found opportunities to commercially exploit the distinctiveness of their marks in those industries. In addition, many other well-known luxury brands have either expanded into or licensed use of their brand names in fields outside of the fashion industry that are related to real estate. For example, Versace now offers interior design services, Fendi provides kitchen design services and Jason Wu markets designer-styled bathroom fixtures. *Id*. ¶ 11, Exs. 84-98. We find these statements and surrounding circumstances of the industry sufficient to show that opposer is likely to suffer an impairment of the distinctiveness of its CHANEL mark.

In summary, we find that based on the record before us, opposer has demonstrated that applicant's CHANEL mark is likely to cause dilution by blurring of its CHANEL trademarks and service marks.

**Decision**: The opposition is sustained on opposer's claim of dilution by blurring. Insofar as we are sustaining the opposition on this ground, we need not consider opposer's remaining claims under Sections 2(a) and 2(d) of the Trademark Act.